1  Miguel A. Custodio, Jr. (SBN 248774)
   Email: custodio@cd-lawyers.com
2  Vineet Dubey (SBN 243208)
   Email: dubey@cd-lawyers.com
3  CUSTODIO & DUBEY LLP
   766 E. Colorado Blvd., Ste 108
4  Pasadena, CA 91101
   Telephone: (213) 785-2909
5  Facsimile: (213) 785-2899

6  James Kawahito (SBN 234851)
   Email: jkawahito@kswlawyers.com
7  Shawn C. Westrick (SBN 235313)
   Email: swestrick@kswlawyers.com
8  Alison Rose (SBN 268937)
   Email: arose@kswlawyers.com
9  KAWAHITO SHRAGA & WESTRICK LLP
   1990 South Bundy Drive, Suite 280
10 Los Angeles, California 90025
   Telephone: (310) 746-5300
11 Facsimile: (310) 593-2520

12 Attorneys for Plaintiffs Timothy Vondersaar, Orlandis Hardy, Jr., Jaarome Wilson,
   Bernard Taruc and Class Members
13

14                    UNITED STATES DISTRICT COURT

15                  FOR THE CENTRAL DISTRICT OF CALIFORNIA

16 | TIMOTHY VONDERSAAR,                  | Case No.: CV12-5027 DDP (AJWx)
17 | ORLANDIS HARDY JR.,                  |
   | JAAROME WILSON, BERNARD              | [Assigned to the Hon. Andrew J. Wistrich
18 | TARUC, individually, and on behalf   | for discovery matters]
19 | of other members of the general      |
   | public similarly situated,           | **DISCOVERY MATTER**
20 |                                      |
21 |             Plaintiffs,              | **MEMORANDUM OF POINTS AND**
   |                                      | **AUTHORITIES IN SUPPORT OF**
22 |        vs.                           | **MOTION TO COMPEL DEPOSITION**
   |                                      | **OF ARTHUR RUBINFELD;**
23 | STARBUCKS CORPORATION, a             | **REQUEST FOR SANCTIONS**
24 | Washington corporation, and DOES     |
   | 1-10,                                | Date:     November 18, 2013
25 |                                      | Time:     10:00 a.m.
26 |             Defendants.              | Place:    Courtroom 690
27 |                                      |
   |                                      | Action Filed:   May 10, 2012
28

|   |   |
|---|---|
| Trial Date: | None Set |
| Discovery Cutoff Date: | None set |
| Judge: | Hon. Dean D. Pregerson |

[Notice of Motion and Motion; Declaration of Vineet Dubey Filed Concurrently Herewith; [Proposed] Order Lodged Concurrently Herewith]

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................1
II. MEET AND CONFER EFFORTS AND STARBUCKS' FAILURE TO PARTICIPATE IN THE JOINT STIPULATION PROCESS ........................3
III. ARGUMENT ........................................................................................................4
    A. Starbucks Should Be Sanctioned For Its Refusal To Participate In the Joint Stipulation Process as Required Under the Local Rules ................4
    B. Starbucks Cannot Meet Its Heavy Burden Of Showing The Applicability Of The "Apex Doctrine." ..........................................................................6
    C. Mr. Rubinfeld Has Unique, Firsthand, Non-Repetitive Knowledge Regarding Starbucks' Common Design Plans And The "Kit of Parts" Used In Its Pre-2004 Stores ..........................................................................9
    D. Plaintiffs Have Exhausted Less Intrusive Discovery Methods ..............12
VI. CONCLUSION ..................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Air West, Inc.,*
   542 F.2d 1090 (9th Cir. 1976) .................................................................... 9

*Blankenship v. Hearst Corp.,*
   519 F.2d 418 (9th Cir. 1975) ...................................................................... 8

*DR Sys., Inc. v. Eastman Kodak Co.,*
   2009 U.S. Dist. LEXIS 83755, (S.D. Cal. Sept. 14, 2009) ......................... 8

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust,*
   2007 U.S. Dist. LEXIS 88625, (N.D. Cal. Nov. 19, 2007) ........................ 8

*Google Inc. v. Am. Blind & Wallpaper Factory,*
   2006 U.S. Dist. LEXIS 67284, (N.D. Cal. Sept. 6, 2006) .......................... 7

*Grateful Dead Prods. v. Sagan,*
   2007 WL 2155693 (N.D. Cal. July 26, 2007) ........................................ 6, 9

*In re Chase Bank USA, N.A. "Check Loan" Contract Litig.,*
   2011 U.S. Dist. LEXIS 127259 (N.D. Cal. Nov. 3, 2011) ....................... 12

*In re Google Litig.,*
   2011 U.S. Dist. LEXIS 120905 (N.D. Cal. Oct. 19, 2011) ........................ 7

*In re Nat'l W. Life Ins. Annuities Litig.,* 2011 U.S. Dist. LEXIS 37746,
   (S.D. Cal. April 6, 2011) ............................................................................ 7

*In re Nat'l W. Life Ins. Deferred Annuities Litig.,*
   2011 U.S. Dist. LEXIS 37746 (S.D. Cal. Apr. 6, 2011) ............................ 7

*Mansourian v. Bd. of Regents of the Univ. of Cal. at Davis,*
   2007 U.S. Dist. LEXIS 95428 (E.D. Cal. Dec. 21, 2007) ........................ 13

*Oracle America Inc. v. Google Inc.,*
   2011 U.S. Dist. LEXIS 79465, (N.D. Cal. July 21, 2011) ....................... 12

1. *Rolscreen Co. v. Pella Products of St. Louis, Inc.*,
2.     145 F.R.D. 92 (S.D. Iowa 1992) ............................................................. 7
3. *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
4.     203 F.R.D. 98 (S.D.N.Y. 2001) ............................................................. 8
5. *WebSideStory, Inc. v. NetRatings, Inc.*,
6.     2007 WL 1120567 (S.D. Cal. Apr. 6, 2007) ................................. 6, 8, 9

**Statutes**

Fed. R. Civ. P 26(c) ............................................................................. 5, 6

**Other Authorities**

*Built for Growth: Expanding Your Business Around the Corner or Across the Globe*,"
    by Arthur Rubinfeld and Collins Hemingway, Wharton School Publishing, 2005 ... 9

## I. INTRODUCTION

Defendant Starbucks Corporation's ("Defendant" or "Starbucks") refusal to produce Arthur Rubinfeld ("Mr. Rubinfeld") for a deposition is simply another in a series of examples of discovery games that Starbucks has engaged in to prevent Plaintiffs from obtaining basic information in this case. On both September 20 and October 1, 2013, Starbucks unequivocally stated that it would not produce Mr. Rubinfeld for a deposition on the ground that he was an "apex" deponent. Ultimately, Starbucks failed to produce him on the date noticed for his deposition.

On October 4, 2013, Plaintiffs sent Starbucks their section of the joint stipulation to compel the deposition of Mr. Rubinfeld. Starbucks refused to provide its section of the joint stipulation for filing pursuant to Local Rule 37-2. Instead, on the day its section was due, Starbucks claimed that the parties were still meeting and conferring about the issue and that it would produce some undisclosed individual instead of Mr. Rubinfeld – a position that Plaintiffs had previously rejected.

There is no basis for Starbucks to shield Mr. Rubinfeld from deposition. Starbucks' profile of Mr. Rubinfeld on its website, which it recently removed, states that he led the company's store development from 1992-2002 and "played a major role in creating the customer experience that defines Starbucks as the company grew from just 100 stores to over 4,000 worldwide." *See* Declaration of Vineet Dubey in Support of Plaintiffs' Motion to Compel ("Dubey Decl."), ¶ 3, Ex. A. It also listed him as the author of *Built for Growth – Expanding Your Business Around the Corner or Across the Globe* (Wharton School Publishing) (2005).[1] *See id.*

One of the major issues at class certification is whether the high hand-off counters in Starbucks' stores were based on a common design. Starbucks recently produced a spreadsheet showing that all Starbucks stores built in California before

---

[1] Relevant excerpts from the book detailing the process used by Starbucks to build out its stores are attached as Exhibit B to the Dubey Decl.

1

CV12-5027 DDP(AJX)          Mot. To Compel Deposition of Arthur Rubinfeld

1  October 2003 contained the high hand-off counters.[2] While Starbucks previously
2  represented that there were no common designs for its stores, Mr. Rubinfeld's book
3  states otherwise. In fact, Mr. Rubinfeld describes in detail how he implemented what
4  he called a "Kit of Parts" approach to rapidly open hundreds of stores. *See id.* at ¶ 4,
5  Ex. B, pp. 5, 10-13. The Kit of Parts consisted of standard, modular components
6  including the hand-off counters, furniture, display panels, bars, *etc.* that each store
7  used. Starbucks pre-fabricated and mass produced these components and then
8  shipped them to store build-outs across the country for assembly. This allowed
9  Starbucks to open hundreds of stores each year, while maintaining a consistency of
10 feel and functionality.

11 The book also explains how he and his design team deliberately designed and
12 mass produced the "eye-level" hand-off counters at issue in this case for use in all of
13 its stores. *See id.* at ¶ 4, Ex. B, pp. 15-16. Mr. Rubinfeld describes how Starbucks
14 believed that these counters, when paired with overhead globe lighting, accentuated
15 the delivery of its beverages. *See id.* at ¶ 4, Ex. B, p. 16. Starbucks considered this
16 part of its branding like the blue boxes from Tiffany's. *See id.*

17 This is no coincidence. As the Starbucks executive vice-president who
18 oversaw store design during the early 1990s until 2002 when virtually every store
19 with the offending counters was built, Mr. Rubinfeld has unique, firsthand, non-
20 repetitive knowledge of facts and events central to issues in this case. In fact, his
21 book details how he oversaw Starbucks' design of the common "eye-level" hand-off
22 counters and how it then mass produced and disseminated those counters through the
23 Kit of Parts. *See id.* at ¶ 4, Ex. B, pp. 5-16.

24 The fact that Mr. Rubinfeld may occupy an elevated position at Starbucks does

---

[2] On September 13, 2013, the parties discussed stipulating to the fact that the stores at issue in this case contained hand-off counters that were built according to common designs. *See* Dubey Decl. at ¶ 9. The parties agreed that this could obviate the need for discovery related to design plans. However, more than a month later, Starbucks finally refused to stipulate to this fact. *See id.* at ¶ 18.

2

not shield him from appearing at a deposition where he has direct, firsthand knowledge of highly relevant issues.

Therefore, this Court should order him to appear for his deposition within ten days of is Order and sanction Starbucks in the amount of $6,500.00 for its discovery abuse. Moreover, since Plaintiffs were forced to proceed with this motion, Starbucks should be ordered to produce Mr. Rubinfeld in Los Angeles, as opposed to Seattle, where Plaintiffs noticed the deposition.

## II. MEET AND CONFER EFFORTS AND STARBUCKS' FAILURE TO PARTICIPATE IN THE JOINT STIPULATION PROCESS

On August 27, 2013, Judge Pregerson rejected Starbucks' attempt to limit the scope of the case to the stores visited by Plaintiffs. On August 28, 2013, Plaintiffs sent Starbucks a request to meet and confer regarding, *inter alia*, depositions for the individuals for whom Plaintiffs had previously noticed. *See* Dubey Decl. at ¶ 6, Ex. D.

Plaintiffs then served their Amended Notice of Deposition of Arthur Rubinfeld on September 5, 2013. *See id.* at ¶ 8, Ex. F. Plaintiff's counsel and defense counsel had a meet and confer phone conference on September 20, 2013, during which defense counsel stated that Defendant would not produce Mr. Rubinfeld for his noticed deposition based on his purported status as an "apex" deponent. *See id.* at ¶ 10. During that same call, Plaintiff's counsel informed defense counsel that the "apex doctrine" did not apply to Mr. Rubinfeld because he possesses special, particularized knowledge and is uniquely qualified to testify regarding Starbucks' common design plans and the "Kit of Parts" approach used in its pre-2004 California stores. *See id.* at ¶ 11.

On October 1, 2013, Plaintiff's counsel and defense counsel had another telephonic meet and confer conference in which defense counsel once again stated that Starbucks would not be producing Mr. Rubinfeld for his deposition. *See id.* at ¶

12. Instead, Starbucks indicated that they would consider providing some undisclosed person who would have similar knowledge. *See id.* Plaintiffs again objected on the grounds that Mr. Rubinfeld has unique, particularized, firsthand knowledge of relevant facts of this case and they therefore intended to pursue his deposition. *See id.* To date, nearly a month after the parties initially met and conferred, Starbucks has not identified anyone that it intends to produce in lieu of Mr. Rubinfeld. *See id.* at ¶ 13.

On October 4, 2013, Plaintiffs sent Starbucks their section of the Joint Stipulation re Plaintiffs' Motion to Compel Deposition of Arthur Rubinfeld ("Joint Stipulation"). *See id.* at ¶ 14, Ex G. Pursuant to Local Rule 37-2.2, Starbucks was required to provide its section of the Joint Stipulation by October 11, 2013. On October 11, 2013, counsel for Starbucks sent an email to Plaintiffs stating that Starbucks intended to offer an unnamed "replacement deponent," but that the parties were still meeting and conferring over the issue. *See id.* at ¶ 15, Ex. H. On that same day, Plaintiffs' counsel indicated that Starbucks had unequivocally refused to produce Mr. Rubinfeld, and that unless Starbucks had changed its mind about producing Mr. Rubinfeld and would provide alternative deposition dates, Plaintiffs would proceed with their motion to compel. *See id.* at ¶ 16, Ex. I. In violation of the Local Rules, Starbucks did not provide its section of the Joint Stipulation by October 11, 2013. *See id.* at ¶ 17.

### III. ARGUMENT

#### A. Starbucks Should Be Sanctioned For Its Refusal To Participate In the Joint Stipulation Process as Required Under the Local Rules

Throughout this case, Starbucks has engaged in an array of bad-faith discovery tactics. Plaintiffs initially noticed Mr. Rubinfeld's deposition for July 15, 2013.[3] *See* Dubey Decl. at ¶ 5, Ex. C. From that point forward, Plaintiffs have insisted on proceeding with Mr. Rubinfeld's deposition. Indeed, on both the September 20, 2013

---

[3] During that period, the parties agreed to stay discovery pending the outcome of Starbucks' motion to dismiss.

1 and October 1, 2013 calls, Plaintiffs indicated that they intended to pursue Mr.
2 Rubinfeld's deposition. *See id.* at ¶¶ 11, 12. Starbucks had ample opportunity to seek
3 a protective order before Mr. Rubinfeld's noticed deposition on October 8, 2013. As
4 part of the protective order, it could have identified the witness it intended to produce
5 with "similar knowledge" and explained why Mr. Rubinfeld did not have unique
6 firsthand knowledge of the events that he himself detailed in his book. Just as before,
7 when Plaintiffs sought an order from this Court requiring Starbucks to participate in
8 recorded phone calls, Starbucks is trying to run out the clock by creating an endless
9 meet and confer process. It refuses to commit to one position or the other and then,
10 when Plaintiffs seek to bring issues before the Court, claims that the parties are still
11 meeting and conferring.[4]

12 Plaintiffs at all times indicated that they intended to proceed with taking Mr.
13 Rubinfeld's deposition. To the extent Starbucks believed that it was not required to
14 produce Mr. Rubinfeld and could instead provide some unnamed witness with
15 "similar knowledge," it should have sought a protective order from this Court **prior to**
16 the date noticed for Mr. Rubinfeld's deposition. *See* Fed. R. Civ. P 26(c) (emphasis
17 added). This is especially true given that Plaintiffs initially served Starbucks with Mr.
18 Rubinfeld's notice of deposition on June 24, 2013. *See* Dubey Decl. at ¶ 5, Ex. C.

19 Even ignoring the fact that Starbucks never sought a protective order before the
20 date of Mr. Rubinfeld's deposition, at a minimum, it was required to participate in the
21 joint stipulation process as required by Local Rule 37-2.2. To the extent that its
22 position is that Plaintiffs failed to exhaust the meet and confer process, then it should
23 have stated this position in its section of the Joint Stipulation. By refusing to

---

[4] Starbucks has engaged in similar games in an attempt to avoid producing 30(b)(6) witnesses on the topics that Plaintiffs have noticed. Starbucks refused to designate individuals to testify about topics by claiming that it wants to meet and confer, and then refusing Plaintiffs' multiple attempts to set up a time to discuss the issue either on a recorded call or with a court reporter present.

participate in the process set forth by Local Rule 37-2.2, Starbucks is again seeking to delay the resolution of important discovery issues.[5]

Local Rule 37-4 provides that sanctions are appropriate where a party fails to cooperate or comply with the provisions regarding the filing of a joint stipulation. Because Starbucks refused to participate in the process and has intentionally delayed the resolution of this matter by forcing Plaintiffs to bring the instant motion under Local Rule 6-1, this Court should sanction Starbucks in the amount of $6,500.00, which represents the time spent by Plaintiffs' attorneys in preparing the Joint Stipulation as well as this motion. *See id.* at ¶ 19.

### B. Starbucks Cannot Meet Its Heavy Burden Of Showing The Applicability Of The "Apex Doctrine."

A party invoking the "apex doctrine" bears the "heavy burden" of showing under Federal Rule of Civil Procedure 26(c) "good cause" as to why the deposition should not go forward. *See WebSideStory, Inc. v. NetRatings, Inc.*, 2007 WL 1120567, *2 (S.D. Cal. Apr. 6, 2007); *Grateful Dead Prods. v. Sagan*, 2007 WL 2155693, *1 (N.D. Cal. July 26, 2007). "It is very unusual…for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances, as such an order would likely be in error." *WebSideStory*, 2007 WL 1120567 at *2.

In determining whether a so-called "apex" deposition can be taken, courts have considered:

> (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. Absent extraordinary circumstances, it is very unusual for a court to prohibit the taking of a deposition. Additionally, when a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition. A claimed lack of knowledge,

---

[5] Pursuant to Local Rule 37-2.4, because Starbucks refused to provide its section of the Joint Stipulation, Plaintiffs are forced to bring this motion under Local Rule 6-1, thus delaying the resolution of this issue by two weeks.

by itself, is insufficient to preclude a deposition. Moreover, the fact that the apex witness has a busy schedule is simply not a basis for foreclosing otherwise proper discovery.

*In re Google Litig.*, 2011 U.S. Dist. LEXIS 120905, *10 (N.D. Cal. Oct. 19, 2011) (internal quotations and citations omitted) (allowing deposition of CEO and denying deposition of President without prejudice to the brining of a further motion to compel). Thus, "[t]he apex deposition principle is not an automatic bar that [the deposition-seeking party] must overcome by a showing of good cause. Rather, it is a protective tool that is selectively employed on a case by case basis when deemed appropriate." *See In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 2011 U.S. Dist. LEXIS 37746, at *13 n.2 (S.D. Cal. Apr. 6, 2011).

Where a witness was the ultimate decision-maker or participated in a relevant decision-making process, courts do not hesitate to find that the witness has the knowledge necessary to justify a deposition. *See, e.g., In re Nat'l W. Life Ins. Annuities Litig.*, 2011 U.S. Dist. LEXIS 37746, *7-9 (S.D. Cal. April 6, 2011) (allowing depositions of top executives where witnesses played central decision-making roles and had "ultimate authority" to take action). As the court explained in *Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 145 F.R.D. 92, 97 (S.D. Iowa 1992), even though an "apex" witness's testimony "may prove to be duplicative in some respects from that provided by lower ranking executives, individuals with greater authority may have the final word on why a company undertakes certain actions, and the motives underlying those actions."

Courts have also found that "apex" deponents possess the requisite knowledge to compel the taking of their depositions where the witnesses:

- Had hands-on involvement with a relevant issue, including issues related to corporate policy, *see, e.g., Google Inc. v. Am. Blind & Wallpaper Factory*, 2006 U.S. Dist. LEXIS 67284, at *9-10 (N.D. Cal. Sept. 6, 2006) (allowing

deposition of Larry Page based on personal involvement in changing Google's trademark policies);

- Performed a relevant analysis, *see, e.g., WebSideStory Inc. v. NetRatings, Inc.*, 2007 U.S. Dist. LEXIS 20481, *12-13 (S.D. Cal. Mar, 22, 2007) (allowing deposition of former CEO and director who was one of two people to have performed a market share analysis that was relevant to the issue of damages);

- Authored or received relevant correspondence, *see, e.g., DR Sys., Inc. v. Eastman Kodak Co.*, 2009 U.S. Dist. LEXIS 83755, *9 (S.D. Cal. Sept. 14, 2009) (allowing deposition where "apex" witness had discussed important letter with CFO and did not direct CFO to investigate letter's allegation of patent infringement, and allowing deposition of another "apex" witness who authored letter);

- Participated in discussions or meetings regarding a relevant topic, *see, e.g., Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, 203 F.R.D. 98, 103 (S.D.N.Y. 2001) (allowing deposition where CEO took part in relevant board of directors meeting and discussions); and

- May have otherwise been a percipient witness to important events, *see Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (plaintiff entitled to depose newspaper publisher who "may have had knowledge" about key letter).

Numerous courts have also noted that "[t]he mere fact . . . that other witnesses may be able to testify as to what occurred at a particular time or place does not mean that a high-level corporate officer's testimony would be 'repetitive.' Indeed, it is not uncommon for different witnesses to an event to have differing recollections of what occurred." *First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 2007 U.S. Dist. LEXIS 88625, *7 (N.D. Cal. Nov. 19, 2007) (allowing deposition where testimony of lower-

8

level employees suggested "apex" witness "may have at least some relevant personal knowledge").

The "apex" exception will prevent the taking of a deposition only where the high-level executive witness does not have firsthand knowledge of the facts underlying the dispute and the deposition would impose an undue burden. *See Grateful Dead Productions,* 2007 WL 2155693 at *3. Therefore, where "a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." *See WebSideStory,* 2007 WL 1120567 at *2; *see also Anderson v. Air West, Inc.* 542 F.2d 1090, 1092-93 (9th Cir. 1976) (approving denial of executive's motion for protective order because he had "knowledge" regarding substance of plaintiffs' claims). Here, Defendant cannot meet the high standard required to prevent Plaintiffs from taking the deposition of Mr. Rubinfeld.

### C. Mr. Rubinfeld Has Unique, Firsthand, Non-Repetitive Knowledge Regarding Starbucks' Common Design Plans And The "Kit of Parts" Used In Its Pre-2004 Stores.

There is no dispute that Mr. Rubinfeld has unique firsthand, non-repetitive, knowledge regarding Starbucks' development of the design and installation of non ADA-compliant hand-off counters in its pre-2004 stores. Starbucks' own website states that Mr. Rubinfeld headed Starbucks' in-house design department that created the blueprint for the company's rapid store expansion in the 1990s until the early 2000s. *See* Dubey Decl. ¶ 3, Ex. A. Moreover, he wrote a book detailing the manner in which he and his design team created and mass produced standard, pre-fabricated components/modules, including the "eye-level" hand-off counters, for use in all Starbucks stores (*Built for Growth: Expanding Your Business Around the Corner or Across the Globe,"* by Arthur Rubinfeld and Collins Hemingway, Wharton School Publishing, 2005). *See id.* at ¶ 4, Ex. B.

Mr. Rubinfeld states in his book that it is "[a] little known secret of Starbucks' success is that the company has had store designers in-house since 1991." *See id.* at ¶ 4, Ex. B, p. 6. He also asserts, "I decided to take a risk and develop the new store prototypes in-house." *See id.* at ¶ 4, Ex. B, p. 7. The book then describes how Mr. Rubinfeld oversaw created and oversaw a "skunk works" team tasked with coming up with store designs. *See id.* at ¶ 4, Ex. B, p. 8. "Access to this group was limited— only a handful of people even knew the team existed." *See id.* The CEO of Starbucks, Howard Schultz, visited with the team to explain his vision for the store designs. *See id.*

Mr. Rubinfed further discusses in his book how his team created a "design playbook," which the team referred to as the "rubber book." *See id.* at ¶ 4, Ex. B, p. 10. This design book contained templates for the interior build-outs for Starbucks stores. *See id.* With the "[n]ew designs in hand, we value-engineered each component to lower its costs for mass production. . ." *See id.*

As Mr. Rubinfeld explains in his book, in order to quickly and inexpensively build-out hundreds of stores, Starbucks' in-house design team developed what was referred to as a "Kit of Parts." *See id.* at ¶ 4, Ex. B, pp. 5, 10-13. This Kit of Parts consisted of components such as fixtures, cabinetry, display racks, counters, bars, drawers, etc. that every store needed. *See id.* Rubinfeld explains that this standardization was necessary to allow Starbucks to build-out hundreds of new stores quickly and inexpensively. *See id.* Starbucks designed and then mass produced these components to be used in all new store build-outs. *See id.* Using computer software, Starbucks laid out the "main components of any new store in modular form, using filler panels for any leftover space." *See id.* at ¶ 4, Ex. B, p. 11. Starbucks outfitted 80% of each store with the standard components from the Kit of Parts. *See id.* The only changes that could be made to individual locations "under this system were the color palette, wall graphics, and seating layout." *See id.* at ¶ 4, Ex. B, p. 13.

One of the critical and common components that was mass produced by Starbucks as part of the Kit of Parts was the raised, curved hand-off counters. Mr. Rubinfeld explains how he designed the raised hand-off counters to be a key part of Starbucks' merchandising in connection with the presentation of beverages. *See id.* at ¶ 4, Ex. B, p. 16. He concluded that items at elbow to eye level have the most visual appeal. *See id.* Therefore, Starbucks "specifically designed a beverage hand-off counter **at eye level**, highlighted by a stylish overhead glass globe light, upon which to present the coffee drink to the customer." *See id.* (emphasis added). Mr. Rubinfeld analogizes Starbucks' delivery of its beverages in this manner to how Tiffany's put its products in signature blue boxes. *See id.* With the hand-off counter at eye level and directly lit from above, Starbucks sought to present the drink to its customers "as a custom-crafted piece of sculpture." *See id.* Based on this idea, Starbucks' in-house design team, headed by Mr. Rubinfeld, designed the eye-level hand-off counters, mass produced them to be included in the Kit of Parts, and then shipped them out to be used in new store build-outs across the country.

One of the central issues in this case is whether the high hand-off counters used by Starbucks in its stores were based on common design(s). Plaintiffs believe it is no coincidence that prior to October 2003,[6] every store built by Starbucks in California contained the high hand-off counters. Moreover, the above statements from Mr. Rubinfeld's book as well as the recent deposition testimony from Andy Metz confirm that Starbucks used standardized, mass-produced hand-off counters in all of its stores. Mr. Rubinfeld, as head of the design department that developed the Kit of Parts and engineered the hand-off counters for mass production, writes about his hands-on involvement in the creation of the common design plans. Moreover, he describes

---

[6] In 2003, Starbucks entered into a settlement agreement that required it to use lowered hand-off counters at all stores in California moving forward. The settlement agreement also required Starbucks to lower counters at existing stores. However, ten years later, hundreds of stores still have the high counters.

11

discussions and/or meetings regarding the creation of the common design plans. By his own admissions in his book, Mr. Rubinfeld undoubtedly has unique, firsthand knowledge of the development of the common plans that led to the non-compliant hand-off counters.

Because Mr. Rubinfeld has direct, first-hand knowledge of, *inter alia,* the design of the "eye level" counters at issue, the manner of production of these counters, the dissemination of these counters to Starbucks stores, and the common designs of the hand-off counters/Kit of Parts during the time period at issue in this case, Starbucks must produce him for a deposition.

### D. Plaintiffs Have Exhausted Less Intrusive Discovery Methods

Courts regularly find that less intrusive discovery methods have been exhausted where the party seeking discovery has already deposed lower-level employees or conducted written discovery, but has been unable to obtain the desired information. *See, e.g., Kennedy*, 2010 U.S. Dist. LEXIS 47866 at *3-4, 7-8. However, many courts have acknowledged that less intrusive discovery methods may not be available where, as here, the "apex" witness personally participated in events at issue. *See Oracle America Inc. v. Google Inc.,* 2011 U.S. Dist. LEXIS 79465, at *6-7 n.1 (N.D. Cal. July 21, 2011) (because CEO likely participated in decision-making regarding critical licensing negotiations, less intrusive discovery methods were exhausted).

For example, in *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.,* 2011 U.S. Dist. LEXIS 127259, at *11-12 (N.D. Cal. Nov. 3, 2011), the court held that less intrusive discovery methods had been exhausted because the "apex" witness was directly involved in key decisions and the desired information was "specific and unique to [the apex witness] and his involvement in" the relevant events. In this situation, any "less burdensome" source "would be a poor substitute for [the 'apex' witness's] testimony regarding his own personal knowledge and actions."

*Mansourian v. Bd. of Regents of the Univ. of Cal. at Davis*, 2007 U.S. Dist. LEXIS 95428, at *10 (E.D. Cal. Dec. 21, 2007).

Plaintiffs' attempted to meet and confer in early September, after Judge Pregerson denied Starbucks motion, to determine if the parties could reach any agreements that would limit the scope of discovery. In particular, in lieu of producing documents related to the design of the hand-off counters at issue, Starbucks' counsel indicated that his client was considering whether to stipulate to the fact that the counters were based on a common design(s). *See* Dubey Decl. at ¶ 9. This would potentially limit the cost and scope of discovery given that of the roughly 763 stores built in California prior to Starbucks' settlement requiring it to use hand-off counters 34 inches or below in all new construction in or around 2004-2005, all of the stores had the unlawful counters.

Despite multiple attempts to resolve this issue, Starbucks finally refused to stipulate that the hand-off counters at issue were based on common design(s). *See id.* at ¶ 18. At the same time, it has continuously objected to providing any documents regarding its Kit of Parts or common design plans that led to all the pre-2004 stores containing the non-compliant hand-off counters. Nevertheless, to the extent Starbucks agrees to stipulate as to the common design of the hand-off counters, Plaintiffs would be willing to limit the scope of Mr. Rubinfeld's deposition.

Similarly specious is Starbucks' contention that it need not produce Mr. Rubinfeld because it intends to produce some unnamed person with "similar knowledge." Starbucks has never identified this person and how he/she would have "similar" knowledge. As set forth explicitly in Mr. Rubinfeld's book, he oversaw the design department that created the hand-off counters at issue. He made the decision to create the hand-off counters at "eye-level" as part of Starbucks' branding. He had conversations with Howard Schultz and other executives regarding the implementation of the Kit of Parts approach to rapidly and cost-effectively churn out

hundreds of stores. Plaintiffs are entitled to probe these and other areas with Mr. Rubinfeld, and Starbucks cannot hide behind a nebulous representation that it will produce some unnamed individual that has "similar" knowledge.

## VI. CONCLUSION

Mr. Rubinfeld has personal and unique knowledge regarding whether the high hand-off counters in Starbucks' pre-2004 stores were designed and installed pursuant to common design plans, which is one of the primary issues to be decided in this case. Therefore, this Court should order Defendant to produce Mr. Rubinfeld in Los Angeles for his deposition within ten days of its Order and issue sanctions in the amount of $6,500.00.

Dated: October 18, 2013

Respectfully submitted,

By:/s/ Vineet Dubey
Vineet Dubey
CUSTODIO & DUBEY LLP
Attorneys for Plaintiff/Class Members